CLERK'S OFFICE
A TRUE COPY
Mar 09, 2022
s/ DarylOlszewski
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Search of )
*(Briefly describe the property to be searched or identify the person by name and address)* )
) Case No. 22 MJ 20
Information more fully described in Attachment A. )
)

### APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ District of _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18, USC, Sections 1951(a) and 2; 18, USC, Sections 924(c) and 2. | Hobbs Act robbery; use, brandishing, and discharge of a firearm during a crime of violence. |

The application is based on these facts:
See attached Affidavit.

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of ___ days *(give exact ending date if more than 30 days: ___)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

David Bianchi, SA FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 3/9/2022

*Judge's signature*

City and state: Milwaukee, WI

Hon. William E. Duffin, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
# AN APPLICATION FOR A SEARCH WARRANT

I, David Bianchi, being first duly sworn, hereby depose and state as follows:

**I.  INTRODUCTION, BACKGROUND, TRAINING, AND EXPERIENCE**

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since January 2020. Since September 2020, I have been assigned to the FBI's Milwaukee Area Violent Crimes Task Force. This Task Force is a multi-jurisdictional law enforcement entity charged with investigating violations of federal law, including bank robberies, commercial robberies and other violent crime matters, defined under Title 18 of the United States Code. I have been trained in a variety of investigative and legal matters, including the topics of Fourth Amendment searches, the drafting of search warrant affidavits, and probable cause. I have assisted in criminal investigations, participating in surveillance, interviews, and debriefs of arrested subjects. As a result of this training and investigative experience, I have learned how and why violent actors typically conduct various aspects of their criminal activities.

2. This affidavit is based upon my personal knowledge, my training and experience, and on information reported to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. This affidavit is also based upon police reports, official records, citizen witnesses' statements, recorded statements, law enforcement surveillance, surveillance video, social media, court records, telephone records, and public records which I consider to be reliable as set forth herein. The facts of this Affidavit are based upon information obtained from my investigation, as well as information I have received from other law enforcement officers.

3. Based on the investigation to date, I submit that there is probable cause to believe that ANTONIO D. MOORE (XX/XX/1992) conspired to commit and committed armed robbery

in Franklin, Wisconsin, on September 02, 2021, in violation of Title 18, United States Code, Sections 1951(a) and 2 (Hobbs Act robbery), and 924(c) and 2 (use, brandishing, and discharge of a firearm during a crime of violence).

4. This affidavit is submitted in support of an application for a search warrant for Antonio MOORE's Facebook Account, and for evidence of Moore's and others' involvement in armed robbery, in violation of Title 18, United States Code, Sections 1951(a), 924(c), on September 02, 2021.

5. More specifically, I seek authorization to search Facebook's information associated with Antonio MOORE, who is the user associated with the Facebook accounts with the following user names and ID numbers:

| FACEBOOK NAME | FACEBOOK IDENTIFICATION (UID) |
|---|---|
| Solo Elevated | 100008737363815 |
| Elevated Solo | 100071157341493 |

6. The information I seek is stored at premises owned, maintained, controlled, or operated by Meta Platform Inc., a social networking company headquartered in Menlo Park, California, from at least approximately March 02, 2021 to the present.

7. Because this affidavit is submitted for the limited purpose of obtaining a search warrant, I have not included each and every fact known to me concerning this investigation. I have attempted to set forth only the facts I believe are pertinent to establishing the necessary foundation for the warrant.

2

## II.     PROBABLE CAUSE

### September 02, 2021 Robbery

8.     On September 02, 2021 at approximately 1:55 PM, two unknown subjects entered the T-Mobile located at 6503 South 27th Street, Franklin, Wisconsin. The subjects are described as follows:

9.     Subject #1: Black male, early 20's, medium height with a stocky build; wearing a dark colored camouflage hooded sweatshirt with the hood pulled tightly around his face, black mask, dark pants, and black shoes; carrying a black handgun.

10.     Subject #2: Black male, early 20's, medium height with a thin build; wearing a dark gray hooded sweatshirt, black surgical mask, light gray pants, and white shoes.

11.     The subjects entered the front door of the business. After briefly walking throughout the store and asking about the phones, Subject #1 presented a black semi-automatic handgun and pointed it at the face of the assistant manager, AV1, (anonymous victim 1). Subject #1 ordered AV1 to the back room of the store where three additional employees were completing online training. Subject #1 ordered all of the employees to lay on the floor by stating, "Get on the floor or I'll kill you!"

12.     Subject #1 then ordered AV1 to walk over to the safe at which time Subject #2 told Subject #1 to shoot AV1 because she wasn't moving fast enough. Subject #1 told AV1 to, "Put the money in the bag." AV1 advised that there was no money in the safe, only cell phones. AV1 then opened the safe and began to put cell phones into a white plastic bag that Subject #2 was holding. Subject #2 then pushed AV1 aside and began to empty the cell phones from the safe into the garbage bag.

13. After removing various items from the safe, including cell phones, watches, headphones, and charging cables, Subject #1 told the employees, who were still laying on the floor, not to touch any of their cell phones.

14. Subject #1 and Subject #2 walked to the front of the store with AV1 and ordered her to open the cash registers. After opening the drawers, Subject #2 grabbed both of the cash register drawers and placed them in the white garbage bag. Subject #2 then exited the front door of the store while Subject #1 ordered AV1 to lay down in the back room again. AV1 then observed Subject #1 exit the front door at which time AV1 locked the door and contacted 911.

15. A subsequent inventory by the T-Mobile manager revealed that 35 items were taken from the safe in the back room valued at $13,615.75. Several bags of US currency were also taken from the safe totaling $1,225.19. A total of $352.52 US currency was taken from the cash registers at the front of the store.

16. A 3SI GPS Tracker had previously been placed in a cell phone box in the safe at the T-Mobile store in the event of a robbery. The 3SI tracker was taken by the Subjects who committed the armed robbery and was activated at 1:56 PM. The 3SI GPS tracker stopped at Glen Oaks Cemetery, located at 4530 North Green Bay Road, Glendale, Wisconsin at 2:18 PM.

17. Officers of the Glendale Police Department responded to the cemetery at 2:26 PM and located a red, 2017 Hyundai Santa Fe in the cemetery. When officers attempted to make contact with the vehicle, the vehicle fled from and eluded officers by driving through a fence in the cemetery. Officers observed that the vehicle was occupied by one individual who matched the description of Subject #1.

18. The 3SI GPS tracker was then tracked to 7946 North 107th Street, Milwaukee, Wisconsin where officers observed Subject #1 flee on foot at the Arbor Ridge Apartment Homes but were unable to apprehend him. The aforementioned Hyundai Santa Fe was located unoccupied

4

and running in the garage of 7946 North 107th Street with extensive front end damage. The vehicle was identified by officers as the vehicle which eluded them. It was later determined that the vehicle was reported stolen on September 01, 2021 at 6539 North 52nd Street, Milwaukee, Wisconsin, and was not associated to the owners of the garage in which it was found. Located in plain view on the front passenger side floorboard were several boxed cell phones that were later determined to be the phones taken during the robbery.

19. Milwaukee Police Department officers walked the flight path of Subject #1 and located a gray, camouflage hooded sweatshirt, identical to the sweatshirt worn by Subject #1 during the robbery, and a black Smith & Wesson M&P Shield firearm, which was consistent with the description of the firearm used during the robbery.

20. After running the serial number on the Smith & Wesson M&P Shield firearm, it was discovered that the firearm was reported stolen with the Milwaukee Police Department on August 27, 2021. The owner of the firearm, JC (XX/XX/1989), identified the brother of his future child's mother, ANTONIO D. MOORE, as a suspect in the theft of his firearm.

21. On September 08, 2021, detectives with Franklin Police Department executed a search warrant on the Hyundai Santa Fe that was used as the getaway vehicle. During a search of the vehicle, detectives located a black Nike bag on the back seat. Located inside the bag was a Wisconsin ID card in the name of ANTONIO D. MOORE JR. Also in the Nike bag was a UMX cell phone. A subsequent historical cell site search warrant showed that the cell phone was registered to ANTONIO MOORE with a listed address of 4671 North 37th Street, Milwaukee, Wisconsin. It should be noted that ANTONIO D. MOORE closely matches the physical description of Subject #1.

22. On September 21, 2021, this affiant sent several items that were located in the getaway vehicle and in the flight path of Subject #1 to the FBI Laboratory in Quantico, Virginia

5

for DNA testing. On February 22, 2022, the FBI Laboratory advised that a Sprite can that was located in the center console of the getaway vehicle returned a possible CODIS (Combined DNA Index System) association with ANTONIO D. MOORE.

### Identification of MOORE's Facebook Account

23. On March 03, 2022, this affiant conducted an open source Facebook query of MOORE's known associates. This affiant identified the Facebook page of MOORE's mother, E.T., which returned to the account: facebook.com/elva.thomas.90. A publicly viewable search of E.T.'s Facebook posts showed that an individual with the Facebook username "Solo Elevated" "liked" a post from February 10, 2022. The page "Solo Elevated" returned to the account: facebook.com/100008737363815. The Facebook User ID associated with this account is: 100008737363815. The publicly viewable "profile picture" associated with this account matched the known photographs of MOORE which were previously located in various law enforcement databases.

24. This affiant then conducted a Facebook query for the username "Solo Elevated" and identified a Facebook account with the username "Elevated Solo." The page "Elevated Solo" returned to the account: facebook.com/100071157341493. The Facebook User ID associated with this account is: 100071157341493. The publicly viewable "profile picture" and information associated with this account matched that of the prior Facebook page "Solo Elevated".

25. MOORE and Subject #2 are not currently in custody and as such an analysis of Moore's Facebook Accounts will assist in locating them and providing further evidence of the known Hobbs Act robbery.

26. The date range of the requested warrant would allow evidence, including articles of clothing, vehicles, weapons, associates, and the planning and preparation of the violations in question to be identified by investigators.

6

Case 2:22-mj-00020-WED   Filed 03/09/22   Page 7 of 18   Document 1

## III. FACEBOOK INFORMATION

27. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

28. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

29. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

30. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these

privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

31. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

32. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

33. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In

addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

34. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

35. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

36. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

37. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

38. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

39. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are

9

free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

40. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

41. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

42. Some Facebook pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group. Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

43. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

44. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

45. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

46. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be

11

evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

47. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

IV. **INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

48. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information

(including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## V. CONCLUSION

49. Based upon the facts contained within this affidavit, I believe that probable cause exists to search Antonio MOORE's Facebook Account for further evidence of his and others' involvement in the armed Hobbs Act robbery described above.

# ATTACHMENT A

*Property to Be Searched*

To the extent that the information described in Attachment B is within the possession, custody, or control of Facebook that is stored at premises owned, maintained, controlled or operated by Meta Platforms, Inc., a company headquartered in Menlo Park, California, Facebook is required to disclose to the government the information for the following accounts and dates:

| FACEBOOK NAME | FACEBOOK IDENTIFICATION (UID) | DATES |
|---|---|---|
| Solo Elevated | 100008737363815 | March 02, 2021 to the present |
| Elevated Solo | 100071157341493 | March 02, 2021 to the Present |

# ATTACHMENT B

## Particular Things to be Seized

**I.  Information to be disclosed by Facebook, Meta Platforms, Inc. ("Facebook")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, Meta Platforms, Inc., including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

    a.    All contact and personal identifying information, including**:** full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

    b.    All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

    c.    All photos uploaded by that user ID and all photos uploaded by any user that have that user tagged in them;

    d.    All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

e. All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

f. All "check ins" and other location information;

g. All IP logs, including all records of the IP addresses that logged into the account;

h. All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

i. All information about the Facebook pages that the account is or was a "fan" of;

j. All past and present lists of friends created by the account;

k. All records of Facebook searches performed by the account;

l. All information about the user's access and use of Facebook Marketplace;

m. The types of service utilized by the user;

n. The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

o. All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

p. All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

II. **Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence, and instrumentalities of violations of 18 U.S.C. §§ 1951(a) (Hobbs Act robbery) and 18 U.S.C. 924(c)

16

(use of firearm during a crime of violence), since January 01, 2021, for the user ID's identified on Attachment A, information pertaining to the following matters:

(a) The relevant offense conduct, any preparatory steps taken in furtherance of the criminal scheme, and communications between Antonio MOORE, and others related to the relevant offense conduct of robbery or Antonio MOORE's possession of a firearm.

(b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c) Evidence indicating the Facebook account owner's state of mind as it relates to the crimes under investigation;

(d) The identity of the person(s) who created or used the user ID; and

(e) The identity of the person(s) who communicated with the user ID about matters relating to relevant offense conduct of robbery.